**ORDERED.**

**Dated:  July 22, 2026**

_____

Jason A. Burgess
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

IN RE:                                                     Case No.: 3:25-bk-03570-BAJ

Nickolas Anthony Gabel,                          Chapter 7


                    Debtor.
_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON DEBTOR'S**
**MOTION TO DISMISS PETITION FOR INVOLUNTARY BANKRUPTCY**

This Case came before the Court for trial upon the *Motion to Dismiss Petition for Involuntary Bankruptcy* (the "Motion") (Doc. 4) filed by Nickolas Gabel ("Mr. Gabel").  The threshold issue before the Court is whether there are three qualified petitioning creditors who hold debts against Mr. Gabel that are not subject to a bona fide dispute.  For the reasons set forth below, the Court finds that the involuntary petition fails to meet this requirement, and therefore the Case must be dismissed.

**Findings of Fact**

On October 3, 2025, an involuntary petition under Chapter 7 of the United States Bankruptcy Code was filed against Mr. Gabel by the following petitioning creditors: (i) Christopher M. Lam ("Mr. Lam"); (ii) Claire J. Lam ("Mrs. Lam") (collectively the "Lams"); (iii) Southern Creek Property Owners Association of Nassau County, Inc. (the "HOA"); and James Faller ("Mr. Faller").  The nature of the claims by the initial petitioning creditors is as follows: (i) Mr. Lamb's claim in the amount of $2,500,000.00 is described as "[v]ictim of fraud, forgery, diverted money and credit card debt," (ii) Mrs. Lam's claim in the amount of $732,297.00 is described as a default on loans; (iii) the HOA's claim in the amount of $35,750.00 is described as "[f]raud, diverted funds"; and (iv) Mr. Faller's claim describes him as being "the holder of an assigned claim for breach of a loan agreement," in the amount of $28,125.00.  (Doc. 1).

On November 7, 2025, Mr. Gabel filed the Motion on the basis that none of the petitioning creditors hold claims against him that are not subject to a bona fide dispute.  The dispute between Mr. Gabel and the Lams arises from a business dispute, which resulted in Mr. Gabel filing a state court lawsuit against the Lams in the Ninth Judicial Circuit in Charleston, South Carolina.[1]  In July of 2025, Mr. Faller and Mr. Lam filed suit against Mr. Gabel in the Southern District of California (the "Federal Lawsuit"), alleging various violations under the Racketeer Influenced and Corrupt Organizations Act ("RICO").  (D.'s Ex. 13).   In response to the Federal Lawsuit, Mr. Gabel filed a Motion to Dismiss which raised (among other things) the questions of standing and the allegation of Mr. Faller's unauthorized practice of law.  (D.'s Ex. 14).

Prior to the dispute, Mr. Gabel and the Lams operated CLNG Homes LLC ("CLNG"), with Mr. Gabel being responsible for the construction of the homes, and the Lams being responsible for

---

[1] The complaint filed by Mr. Gabel against the Lams alleges the following: breach of fiduciary duty, declaratory relief, breach of contract, defamation, civil conspiracy, and accounting. (D's Ex. 12).

funding the projects and generally handling the business's finances.  Mr. Gabel and the Lams have conflicting theories as to what led to the demise of the business.  Mr. Gabel alleges that the Lams improperly withdrew money from the company that was owed to creditors and subcontractors, while the Lams allege various fraudulent business practices by Mr. Gabel ultimately caused the company to collapse.  On September 5, 2025, CLNG was placed into Chapter 11 by Mr. Lam who purported to be the 100% owner of CLNG.  Mr. Gabel disputed this based on the assertion that because he held a 50% ownership in CLNG, Mr. Lam did not possess the corporate authority to unilaterally file the case.  (Case No. 3:25-bk-03106-BAJ, Doc. 43).  By agreement of the parties, the CLNG bankruptcy case was dismissed on April 16, 2026.  Id. (Doc. 154).

At the trial, the Lams acknowledged during their testimony that the promissory note claimed to be owed to them as petitioning creditors, is a debt owed to Lam Investment, LLC.  (Tr. pp. 30-31, 35, 40), (P.'s Ex. 2).[2]  Mr. Lam also testified that the debt arising out of the promissory note is the sole debt he claimed against Mr. Gabel in the involuntary petition.  (Tr. 31-32).  Mrs. Lamb testified that the debt on which her claim is based arises out of "money that we put in personally into the Florida businesses."  (Tr. p. 35).

The debt claimed by Mr. Faller was assigned to him on September 16, 2025, merely two weeks prior to the involuntary filing.[3]   The borrower on the Promissory Note (the "Note") *assigned* to Mr. Faller is listed as Nickolas Gabel, Managing Member of Gabel Groups, LLC, and the lender is listed as Specialized Trust Company Custodian FBO LPS 401K Plan.  (D's Ex. 2, p. 9).  Further, the text below Mr. Gabel's electronic signature specifically reads "Nickolas Gabel –

---

[2] The Promissory Note specifies that Mr. Gabel "promises and agrees to pay Lam Investment LLC … the principal sum of [$100,000.00]."  The "Holder" of the note is listed as "Lam Investment LLC," and Mr. Lamb signed the note in his capacity as Lam Investments "Managing Member."  (P's Ex. 2).

[3] The Assignment of Claim Agreement lists Jason Steward as the Assignor and James S. Faller, II as the Assignee. (Claim 1-1, pp. 11-12).

Member of Gabel Groups, LLC." (D's Ex. 2, pp. 9, 12). Mr. Gabel's position is that he signed the Note in his official capacity as managing member of Gabel Groups, LLC.[4] Mr. Faller, who was *not* involved in the transaction, argues that the Court should determine that Mr. Gabel signed the Note in his individual capacity.

Notably, Mr. Faller testified at the trial that he paid "nothing" for the claim he filed, and that the claim was assigned to him because it was "inconvenient" for the assignor to deal with the matter. (Tr. p. 20). Mr. Faller further acknowledged that if the $28,000.00 claim was collected, he would pay that sum to the assignor. Although Mr. Faller is not licensed to practice law in any jurisdiction, he testified that his "legal work" is his ministry and acknowledged that he was performing the work he undertook in this Case to help Mr. Lam.[5] (Tr. p. 21). Mr. Faller also filed a second claim against Mr. Gabel in the amount of $90,000.00. (D.'s Ex. 3). At trial, Mr. Faller testified that the work attributable to the claim is exclusively for work done in connection with CLNG properties. (Tr. pp. 26-27).

The HOA was also a party to the initial petition and described the nature of its claim as "fraud, diverted funds," in the amount of $35,750.00. Subsequently, the HOA filed Proof of Claim 4-1 ("Claim 4") in the amount of $44,000.00. Claim 4 is signed by the purported attorney for the HOA, and notices are directed at being sent to Anna Richardson. No supporting evidence is attached to Claim 4, and the basis of the claim is listed as "stolen funds due to creditor."

In the HOA's response in opposition to the Motion, the HOA attached an affidavit signed by an individual who purchased residential property located in the subdivision governed by the

---

[4] The mortgage deed specifically defines the mortgagor as the "Gabel Group LLC." (D's Ex. 2, p. 6).

[5] After Mr. Faller acknowledged that he stated in his deposition that he was doing this to help Mr. Lam, he then backtracked his statement to clarify that he "wasn't doing this collecting of this to help out Mr. Lam. I'm talking about the case in general." (Tr. p. 22). The Court does not find this statement credible. At best, it is creative word splicing by Mr. Faller.

HOA. (Doc. 17). The affidavit alleges that at the closing of the property, Mr. Gabel misdirected funds earmarked for the HOA to another company owned by him. At the trial, Anna Richardson briefly testified that she became treasurer of the HOA in November of 2025, and that she does not recall signing the involuntary petition.[6] Mr. Gabel maintains that in his *individual* capacity he does not owe the HOA money.

After the filing, several other individuals joined in the involuntary petition. On December 2, 2025, a Notice of Joinder in Involuntary Petition, was filed by Yensi Moret and Iraida Moret (collectively the "Morets"), who are the owners of Akom and R, LLC. The Morets are contractors in the business of heating and air conditioning and assert that they performed work and furnished materials on projects for Mr. Gabel and/or his related entities. In connection with the materials and services provided, the Morets allege they hold a claim in excess of $180,000.00 against Mr. Gabel that is not subject to a bona fide dispute. (D's Ex. 10). Mr. Gabel disputes this and maintains that any debt owed is to Akom and R LLC, for work performed for Southern Legacy Home Builders, LLC, and not to the Morets in their individual capacity. At the trial, Mr. and Mrs. Moret acknowledged in their testimony that it was their company Akom and R, LLC, which performed work for Southern Legacy Home Builders, as well as some other companies that Mr. Gabel has an ownership interest in.[7] (Tr. pp., 42, 43, 48, 51) (P.'s Ex. D, Tab 6).

On December 9, 2025, Kevin Hensley, the owner of KLT Construction, Inc., also filed a Declaration and Notice of Joinder, in which he alleges that he "is a licensed general contractor who has performed labor, provided materials, furnished equipment, and obtained building permits

---

[6] At the trial, Mr. Faller stated that Anna Richardson is his wife.

[7] Mr. Moret specifically testified that he had never performed any work for Mr. Gabel personally. (Tr. p. 43).

for residential construction projects in Florida for [Mr. Gabel] and a multitude of companies he controls" and that he is owed not less than $150,000.00 for his construction services.  (D's Ex. 6). Mr. Gabel disputes this and maintains that any debt owed is to KLT Construction, Inc., for work performed for Southern Legacy Home Builders, LLC.  In support, Mr. Gabel references the Qualifier Agreement which states that the business relationship was between KLT Construction, Inc., Principal Kevin Hensley (hereinafter "Qualifier"), and Southern Legacy Home Builders, LLC, SLHB LLC, Gabel Groups, LLC, CLNG Homes, LLC and principals, partners members and subsidies.  (D.'s Ex. 9). At trial, Mr. Hensley testified that it was his company KLT Construction, Inc., which performed work for Southern Legacy Home Builders and other companies owned in part by Mr. Gabel. (Tr. p. 101).

Testimony was also presented by various individuals as to concerns related to alleged fraudulent activity in Mr. Gabel's business practices and bookkeeping for the companies he has an ownership interest in.

### Conclusions of Law

In analyzing whether the involuntary petition is properly before the Court, "the court must determine whether the creditors who filed the petition are eligible to do so. If the petitioning creditors lack standing, the bankruptcy court lacks jurisdiction over the case, and thus the involuntary case must be dismissed." In re Rosenberg, 414 B.R. 826, 840 (Bankr. S.D. Fla. 2009), subsequently aff'd, 472 F. App'x 890 (11th Cir. 2012). The Bankruptcy Code establishes requirements that an involuntary petition must satisfy to proceed if a proposed debtor has 12 or more creditors.  Specifically, 11 U.S.C. § 303 provides that there must be:

> [t]hree or more entities, each of which is either a holder of a claim
> against such person that is not contingent as to liability or the subject
> of a bona fide dispute as to liability or amount, or an indenture
> trustee representing such a holder, if such noncontingent, undisputed

claims aggregate at least $21,050 [originally "$10,000", adjusted effective April 1, 2025] more than the value of any lien on property of the debtor securing such claims held by the holders of such claims.

11 U.S.C. §303(b)(1). It is undisputed that Mr. Gabel has 12 or more creditors, which means the requirement of having three or more eligible petitioning creditors who held a claim that was not subject to a bona fide dispute as to the liability or the amount must be satisfied. Mr. Gabel maintains that this requirement has not been satisfied and that the involuntary petition should therefore be dismissed. For the reasons set forth below, the Court agrees.

As aptly noted by Judge Glenn, "Section 303(b) restricts a party's right to file an involuntary petition because an involuntary bankruptcy case is a severe remedy, and Congress prefers that creditors settle their disputes without resorting to the involuntary bankruptcy procedure." In re Biogenetic Techs., Inc., 248 B.R. 852, 856 (Bankr. M.D. Fla. 1999); see also, In re Taub, 439 B.R. 261, 273 (Bankr. E.D.N.Y. 2010); In re DSC, Ltd., 486 F.3d 940, 945 (6th Cir. 2007) (quoting In re Lough, 57 B.R. 993, 997 (Bankr.E.D.Mich.1986) ("Congress has made clear that it intended to disqualify a creditor whenever there is any legitimate basis for the debtor not paying the debt, whether that basis is factual or legal."). Importantly, the petitioning creditor is responsible for establishing a prima facie case that the claim is not subject to a bona fide dispute. In re Biogenetic Techs., Inc., 248 B.R. at 856. Only if the petitioning creditor is successful, does the burden shift to the debtor to show that a bona fide dispute does exist. Id.

"The Bankruptcy Code does not define the phrase 'bona fide dispute,' but a majority of courts, including bankruptcy courts in Florida, apply an objective standard." Farmers & Merchs. State Bank v. Turner, 518 B.R. 642, 649 (Bankr. N.D. Fla. 2014) (citation omitted); see also Collier on Bankruptcy, supra, ¶ 303.11. A claim is disputed under this standard if there is "a genuine issue of material fact that bears upon the debtor's liability to the petitioning creditor, or a

7

meritorious contention as to the application of law to undisputed facts, the claim is subject to a bona fide dispute." In re Biogenetic Techs., Inc., 248 B.R. at 856 (quoting In re Audio Visual Workshop, Inc., 211 B.R. 154, 157 (Bankr. S.D.N.Y. 1997)); see also In re Rosenberg, 414 B.R. 826, 845 (Bankr. S.D. Fla. 2009). In other words, "if there are substantial legal or factual questions raised by the debtor, the debtor can preclude the creditor from being an eligible petitioning creditor." 2 Collier on Bankruptcy ¶ 303.11[1]. Further, as recognized by a District Court in the Middle District of Florida,

> Section 303(b)(1) provides that a "bona fide dispute" may exist as to either "liability or amount," but the text does not clarify whether a dispute as to any amount of a petitioning creditor's claim is grounds for dismissal. Some courts hold that a dispute as to any amount is enough for dismissal, while others hold that the amount in dispute must be "material" in the sense that it must lower the total amount of the claim below the statutory threshold. See Mont. Dep't of Revenue v. Blixseth, 942 F.3d 1179, 1185 (9th Cir. 2019) (collecting cases). Although the Eleventh Circuit has not yet ruled on this issue, both circuit courts that have directly addressed this question held that a dispute as to any amount of the claim is fatal under the plain language of the statute. Id. at 1186 ("We agree with our sister circuits' adherence to the statute's plain meaning ...."); see also Fustolo v. 50 Thomas Patton Drive, LLC, 816 F.3d 1, 10 (1st Cir. 2016) ("We decline to read a materiality requirement into section 303.").

Meak v. The Bay Club of Naples II, LLC, No. 2:20-CV-56-JLB, 2021 WL 1423800, at *9 (M.D. Fla. Mar. 24, 2021) (emphasis in original). It is also important to recognize that pursuant to 11 U.S.C. § 303(b) "bankruptcy courts engage in only a limited analysis of a petitioning creditor's claims to determine the presence or absence of a bona fide dispute, but do not attempt to resolve the outcome of any dispute." In re Adams, No. 2:22-BK-00820-FMD, 2022 WL 5238941, at *2 (Bankr. M.D. Fla. Oct. 6, 2022); see also, Farmers & Merchants, 518 B.R. at 649; In re Manhattan Indus., Inc., 224 B.R. 195, 199 (Bankr. M.D. Fla. 1997).

The Court will first look at whether the petitioning creditors who signed the involuntary petition were eligible to do so.  At the trial, the Lams acknowledged during their respective testimony that the Note claimed to be owed to them as petitioning creditors, is a debt owed to Lam Investment, LLC.  (Tr. pp. 30-31, 35, 40).  Mr. Lam also testified that the debt arising out of the promissory note is the sole debt he claimed against Mr. Gabel in the involuntary petition.  (Tr. 31-32).  Mrs. Lamb testified that the debt on which her claim is based arises out of "money that we put in personally into the Florida businesses." (Tr. p. 35).  The evidence clearly shows that the debt claimed by the Lams is not owed to them personally but to Lam Investment, LLC.  As stated above, an involuntary bankruptcy is a "severe" remedy, therefore the Court cannot merely gloss over the fact that the debt is legally owed to Lam Investment, LLC.

Next, the Court will examine the debt claimed by Mr. Faller.[8]  Upon review, various concerns are immediately self-evident.  First, the Court notes that the borrower on the Note *assigned* to Mr. Faller is listed as Nickolas Gabel, Managing Member of Gabel Groups, LLC and that the lender is listed as Specialized Trust Company Custodian FBO LPS 401K Plan.  (D's Ex. 2, pp. 9, 12).  Mr. Gabel asserts he signed the Note in his official capacity as managing member of Gabel Groups, LLC.  Further, the mortgage deed defines the mortgagor as "Gabel Group LLC," which lends additional credence to Mr. Gabel's assertion.  (D.'s Ex. 2, p. 6).  Conversely, Mr. Faller, who was *not* involved in the transaction, maintains that Mr. Gabel signed the Note in his individual capacity.  Therefore, there is clearly a bona fide dispute between the parties as to whether Mr. Gabel signed the Note in his official capacity as the managing member of Gabel Groups.  An additional concern is Mr. Faller's testimony that he paid "nothing" for the claim he

---

[8] Although Mr. Faller filed a second claim against the Debtor for $90,000.00, the work attributable to the claim is exclusively for work done in connection with CLNG properties.  (Tr. pp. 26-27).  Mr. Faller acknowledged this in his testimony, and the evidence is clear that the claim was not properly filed in this Case.

filed, and that the claim was assigned to him because it was "inconvenient" for the assignor to deal with the matter.  (Tr. p. 20).  Mr. Faller further acknowledged that if the $28,000.00 claim was collected, he would pay that sum to the assignor.  Mr. Faller went on to explain the following:

> [M]y legal work is my ministry.  I am an ordained minister, and I do
> a lot of cases all over the country with lawyers like Mr. McClain,
> and this was just one more of them.[9]

The record in this Case speaks for itself, and given the lack of mutual consideration,[10] the Court cannot reasonably ascertain a valid explanation for the assignment of the claim to Mr. Faller other than for the purpose of gaining a litigation advantage as to the filing of the involuntary petition.[11]  Notably, Mr. Faller acknowledged at the hearing that he was performing the legal work to help Mr. Lam.[12]  (Tr. p. 21).  Consequently, the Court finds that Mr. Faller's involvement in the involuntary filing was to serve an improper purpose.[13]

As to the HOA, Mr. Gabel maintains that he does not owe the HOA money in his individual capacity.  The Court finds that the HOA failed to produce sufficient evidence to support their allegations.  At the trial, Anna Richardson, the treasurer of the HOA merely testified that she

---

[9] Mr. Faller is *not* a licensed attorney.  He is an individual appearing *pro se* before the Court.

[10] Considering the totality of the circumstances, the lack of mutual consideration greatly concerns the Court.  The integrity of the bankruptcy process must be protected, and the United States Trustee may want to investigate the issue for possible referral to the United States Attorney's Office.

[11] Curiously, the assignment to Mr. Faller contains the following language, "[t]he parties agree this transfer is made in good faith, for fair value, and not for the purpose of collusion or solely to commence an involuntary bankruptcy case." (D's Ex. 2, p. 11). Given the circumstances surrounding the assignment, and the events that transpired thereafter, this language appears at best suspicious and at worst done in direct anticipation of teeing up the involuntary filing.

[12] After Mr. Faller acknowledged that he stated in his deposition that he was doing this to help Mr. Lam, he then backtracked his statement to clarify that he "wasn't doing this collection of this to help out Mr. Lam. I'm talking about the case in general." ( Tr. p. 22).  The Court does not find this statement credible.  At best, it is creative word splicing by Mr. Faller.

[13] See In re Silverman, 230 B.R. 46, 53-54 (Bankr. D.N.J. 1998) (finding that the petitioning creditor sought to gain a litigation advantage, which meant the intent of the involuntary petition was to serve an improper purpose); see also In re PTGi Int'l Carrier Servs., Inc., 668 B.R. 517, 523 (Bankr. D. Del. 2025).

became treasurer in November of 2025, and that she does not recall signing the involuntary petition. Further, even *if* the Court were to find that the HOA qualified as a valid petitioning creditor, the debt is clearly subject to a bona fide dispute.

Next, the Court will address the petitioners who subsequently joined in the filing of the involuntary petition. The Morets both testified that their company Akom and R, LLC, performed work for Southern Legacy Home Builders, as well as some other companies that Mr. Gabel holds an ownership interest in. (Tr. pp. 42, 43, 48, 51) (P.'s Ex. D, Tab 6). Similarly, Mr. Hensley testified that his company KLT Construction, Inc. performed work for Southern Legacy Home Builders and other companies owned in part by Mr. Gabel. (Tr. p. 101). Further, the Qualifier Agreement specifically sets forth that the business relationship was between KLT Construction, Inc., Principal Kevin Hensley (hereinafter "Qualifier"), and Southern Legacy Home Builders, LLC, SLHB LLC, Gabel Groups, LLC, CLNG Homes, LLC and principals, partners members and subsidies. (D.'s Ex. 9). The Court finds the testimony of the Morets and Mr. Hensley credible and recognizes that the alleged events from their business dealings with companies Mr. Gabel holds an ownership interest in have left them in very precarious financial situations. As previously explained, however, the significance of legal formality cannot be disregarded, especially when dealing with the serious nature of an involuntary petition and the consequences it carries. Therefore, the Court finds that Mr. and Mrs. Moret and Mr. Hensley do not qualify as petitioning creditors under 11 U.S.C. § 303.

The Court also finds that even *if* the petitioning creditors were eligible to sign the involuntary petition, their respective claims are subject to a bona fide dispute in contravention of 11 U.S.C. § 303(b)(1). Bankruptcy is to "serve as a shield for debtors, not as a sword for creditors."

In re Prisuta, 121 B.R. 474, 476 (Bankr. W.D. Pa. 1990); see also In re Byrd, 357 F.3d 433, at 438 (4th Cir. 2004) (recognizing "the purpose of the 'bona fide dispute' provision is to prevent creditors from using involuntary bankruptcy 'to coerce a debtor to satisfy a judgment even when substantial questions may remain concerning the liability of the debtor'" (quoting In re Prisuta, 121 B.R. at 476).   Generally, when a petitioning creditor's claim is based on "an unappealed, unstayed judgment," the claim is not subject to a bona fide dispute.  In re Biogenetic Techs., 248 B.R. at 857 (citing In re Manhattan Indus., 224 B.R. at 200).  However, "this rule is not absolute, and courts have found a bona fide dispute in certain situations where the claim was based on a judgment that was incorrect or partially satisfied."  Farmers & Merchants, 518 B.R. at 649–50, see also, In re Byrd, 357 F.3d 433, 439 (4th Cir. 2004).  In this Case, the petitioners do not hold a judgment against Mr. Gabel, and the evidence submitted in support of their respective positions does not come close to approaching the high bar required for the Court to deem that bona fide disputes do not exist.

Because the involuntary petition was not filed in accordance with the requirements of 11 U.S.C. § 303, the Court need not reach the issue of the corporate veil piercing arguments. However, the Court finds it important to note that it has previously held that "[p]iercing the corporate veil is an extraordinary remedy."  In re Nilhan Fin., LLC, 652 B.R. 381, 389 (Bankr. M.D. Fla. 2023); see also In re Checiek, 492 B.R. 918, 920 (Bankr. M.D. Fla. 2013) ("[u]nder Florida law, courts are permitted to disregard the corporate form (and pierce the corporate veil) only in the most extraordinary cases.").  The Court is mindful of the serious nature of the allegations and the consequences flowing from those allegations, which is why the Court afforded the parties a full day trial to present testimony and proffer evidence.  While the Court will not

12

delve into the veil piercing matter, what was presented to the Court was largely more supposition than actual evidence needed to support the *extraordinary* remedy sought of corporate veil piercing.

**Conclusion**

Nearly three decades ago, Judge Glenn correctly recognized that the filing of "an involuntary bankruptcy case is a severe remedy, and Congress prefers that creditors settle their disputes without resorting to the involuntary bankruptcy procedure." In re Biogenetic Techs., Inc., 248 B.R. at 856. Judge Glenn's ruling has not only withstood the test of time but has been further solidified by the level of scrutiny applied by courts to involuntary bankruptcy filings.

Crucially, the Court's ruling is *narrowly* tailored to the issue of whether the involuntary petition meets the requirements of 11 U.S.C. § 303. As set forth above, a petitioning creditor is responsible for establishing a prima facie case that the claim is not subject to a bona fide dispute. The petitioning creditors failed to meet this burden, which means the burden was not shifted to Mr. Gabel to show that a bona fide dispute does exist.

The Court has neither considered nor reached the merits of the serious allegations asserted by the petitioning creditors. By this decision, the Court is simply finding that the bankruptcy forum is *not* the proper venue for the creditors' disputes against Mr. Gabel and therefore finds it appropriate to grant the Motion and dismiss the Case with prejudice. The Court appreciates and respects the candor of the witnesses who testified in support of the involuntary filing. The Court also appreciates the decorum exhibited, especially considering the magnitude that the allegations have on the individuals and companies involved.[14] Nothing in the Court's decision prevents the

---

[14] The Court cautions the creditors who did business with Mr. Gabel and his companies to be wary of associating with and accepting the assistance of individuals who are not licensed to practice law in their future pursuits of this matter. Showmanship and "games," such as the assignment of a note for the sole purpose of gaining a litigation advantage only distracts from the serious nature of the issues involved. Such antics are not rewarded in this Court. The creditors' time, money, and efforts would be much more wisely spent by having a licensed attorney deal with the magnitude of the unfortunate chain of events that has unfolded in this matter.

creditors from pursuing their allegations against Mr. Gabel in state court or a federal district court. The Court will enter an Order Dismissing the Case with Prejudice consistent with these Findings of Fact and Conclusions of Law.